## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GRADUATE OPERATOR LLC d/b/a GRADUATE POST ACUTE; | |
| WILLOW GROVE OPERATOR LLC d/b/a WILLOW GROVE POST ACUTE; | |
| EXTON OPERATOR LLC d/b/a EXTON POST ACUTE; and | Civil Action No. _____ |
| BAY HARBOR OPERATOR LLC d/b/a BAY HARBOR POST ACUTE; | |
| *Plaintiffs,* | |
| v. | **Jury Trial Demanded** |
| WHITE OAK HEALTHCARE FINANCE, LLC, | |
| *Defendant.* | |

## COMPLAINT

Plaintiffs Graduate Operator LLC d/b/a Graduate Post Acute, Willow Grove Operator LLC d/b/a Willow Grove Post Acute, Exton Operator LLC d/b/a Exton Post Acute, and Bay Harbor Operator LLC d/b/a Bay Harbor Post Acute (collectively, "New Operators") file this Complaint against Defendant White Oak Healthcare Finance, LLC ("White Oak"), seeking damages and other relief resulting from White Oak's misappropriation and unlawful retention of Plaintiffs' property in breach of contractual and non-contractual duties it owes to Plaintiffs. In support of such relief, Plaintiffs allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this diversity action to recover their property – specifically, Medicare and third-party payor payments for services provided by Plaintiffs – from White

Oak. White Oak has used the Plaintiff's property to reduce its exposure to the debt owed by its borrower, Genesis Healthcare, Inc. and certain of its affiliates known as "Existing Operators" in the pertinent agreements (collectively, "Genesis").[1] White Oak has no right to retain these payments, and Plaintiffs are entitled to recover them through claims sounding in contract, quasi-contract, and tort.

2.      Plaintiffs are in the business of operating skilled nursing facilities ("SNFs"). In 2024, Plaintiffs acquired the right to operate four such facilities from non-party Genesis.

3.      As SNF operators, Plaintiffs are entitled to payments from Medicare and certain third-party payors (e.g., HMOs) for services provided at their facilities (the "Post-Closing Reimbursement Funds"). As is commonplace in the industry, and as authorized by the OTAs, during a months-long post-acquisition transition period, Plaintiffs billed for those services using Genesis's Medicare provider numbers and pursuant to Genesis's contracts with third-party payors. As a result, the Post-Closing Reimbursement Funds are paid into accounts belonging to the Genesis entities during that transition period.

4.      From before the OTAs were executed through the present, White Oak loaned Genesis cash through an asset-based lending agreement. Pursuant to that Agreement, each day, the payments Genesis receives from Medicare and other third-parties are swept into an account held by White Oak. White Oak may then extend additional funding to Genesis.

---

[1]     The operations transfers were made pursuant to: (i) an Operations Transfer Agreement dated as of December 31, 2024 ("December 31 OTA"), attached as Exhibit 1; and (ii) a Management and Operations Transfer Agreement dated as of May 9, 2024 ("May 9 OTA"), attached as Exhibit 2. Those two agreements are collectively referred to as the "OTAs".

5.      To both allow that process to continue and protect the New Operators' right to the Post-Closing Reimbursement Funds, Genesis, White Oak, and the New Operators entered a Facility Accounts Transition Agreement ("FATA") at least with regard to the Exton Post Acute, Graduate Post Acute, and Willow Grove Post Acute SNFs.

6.      Under the FATA, White Oak was permitted to sweep the Post-Closing Reimbursement Funds each day. In exchange, White Oak recognized that such funds did not belong to it and must be returned to Genesis for payment to the New Operators.[2]

7.      To implement this agreement, the FATA imposed an obligation on Genesis to provide daily reconciliation reports to White Oak that identified funds belonging to New Operators. White Oak was then required to turn over those funds to Genesis. Upon receipt, Genesis was obligated to return such funds to the New Operators immediately.

8.      But that did not happen. By the summer of 2025, Genesis was insolvent. With Genesis's bankruptcy looming, the Post-Closing Reimbursement Funds stopped flowing to the New Operators. Upon information and belief, White Oak instead swept those funds and used them to reduce the balances Genesis owed under their ABL agreement.

9.      The New Operators requested, but have not received, the reconciliation reports they need to determine exactly *how* White Oak and Genesis carried out this scheme. Upon information and belief, with Genesis's bankruptcy on the horizon, White Oak and Genesis stopped (or failed to carry out) or delayed the reconciliation process so that White Oak kept the Post-Closing Reimbursement Funds for itself. But even if the

---

[2]      The January 1, 2025 Facility Accounts Transition Agreement between, *inter alia*, New Operators, Existing Operators (owned and/or controlled by Genesis) and White Oak is attached as Exhibit 3.

reconciliation process in fact continued (and there is no evidence it did), White Oak *still* breached the FATA when it failed to turn over to Genesis the Post-Closing Reimbursement Funds that it identified on the reconciliation reports. Either way, White Oak knew that it was sweeping funds belonging to New Operators and failing to remit them to Plaintiffs.

10.     That process continued until Genesis filed for bankruptcy in July 2025. In its bankruptcy proceedings, Genesis confirmed that White Oak swept the Post-Closing Reimbursement Funds and conceded that it had not returned such funds to the New Operators.

11.     Shortly after learning of White Oak's tortious conduct, Plaintiffs demanded that White Oak account for and return their property. A copy of that letter is attached as Exhibit 4. White Oak responded and contended, among other things, that if Plaintiffs wanted to protect their property, they should have negotiated a FATA but did not (there is a FATA between at least some of the New Operators and White Oak); Plaintiffs bore the risk of Genesis's failure to hold their property in trust; and White Oak was allowed to sweep Genesis's accounts and keep whatever funds it swept, without regard to Plaintiffs. *See* Exhibit 5. Accordingly, White Oak refused to return Plaintiffs' property and has retained it, necessitating this lawsuit.

12.     As a result of White Oak's indisputable breaches of its duties to Plaintiffs, New Operators seek the entry of judgment and all appropriate relief, including, *inter alia*, an Order requiring White Oak to: (1) return all such sums belonging to Plaintiffs, which total at least ***$2.2 million***, and refrain from dispersing such amounts to any other person; and (2) account for all sums White Oak has swept from Genesis's bank accounts since May 9, 2024.

## PARTIES

13.     Plaintiffs are limited liability companies that own and operate SNFs and other senior living communities.

14.     Plaintiff Graduate Operator LLC d/b/a Graduate Post Acute is a limited liability company. It is a party to the December 31 OTA and operates Graduate Post Acute, a SNF located at 1526 Lombard Street, Philadelphia, PA 19146.

15.     The sole member of Graduate Operator LLC is Graduate Holdco LLC.

16.     Plaintiff Willow Grove Operator LLC d/b/a Willow Grove Post Acute is a limited liability company. It is a party to the December 31 OTA and operates Willow Grove Post Acute, a SNF located at 3485 Davisville Road, Willow Grove, PA 19040.

17.     The sole member of Willow Grove Operator LLC is Willow Grove Holdco LLC.

18.     Plaintiff Exton Operator LLC d/b/a Exton Post Acute is a limited liability company. It is a party to the December 31 OTA and operates Exton Post Acute, a SNF located at 501 Thomas Jones Way, Exton, PA 19341.

19.     The sole member of Exton Operator LLC is Exton Holdco LLC.

20.     Collectively, Plaintiffs Graduate Operator LLC d/b/a Graduate Post Acute, Willow Grove Operator LLC d/b/a Willow Grove Post Acute, and Exton Operator LLC d/b/a Exton Post Acute are the three "New Operators" as defined in the December 31 OTA. They are also parties to the FATA with White Oak.

21.     Plaintiff Bay Harbor Operator LLC d/b/a Bay Harbor Post Acute is a limited liability company. It is a party to the May 9 OTA and operates Bay Harbor Post Acute, a SNF located at 200 Civic Avenue, Salisbury, Maryland 21804. It is the "New Operator" under the May 9 OTA.

22.    Graduate Holdco LLC, Willow Grove Holdco LLC, Exton Holdco LLC, and Bay Harbor Operator LLC each have the same members: Quinto Nexgen LLC, Skilled Ventures LLC, and UKR Nexgen LLC.

23.    The members of Quinto Nexgen LLC are Tryko Nexgen Holdings LLC and RSBRMK Holdings LLC. The members of Tryko Nexgen Holdings LLC are: YR Nexgen Trust, SK Nexgen Trust, and YK Nexgen Trust. The trustees of YR Nexgen Trust are Tzvi Levovitz and Osher Flagler. The trustees of each of SK Nexgen Trust and YK Nexgen Trust are Yitzchok Rokowsky and Tzvi Levovitz. The members of RSBRMK Holdings LLC are: (1) NFR 2020 Irrevocable Trust, whose trustees are Yitzchok Rokowsky and Mindee Posen, and (2) Fraide Rokeach, who is a citizen of New Jersey.

24.    The members of Skilled Venture LLC are Boruch Munk and Devorah Munk, each of whom is a citizen of New Jersey.

25.    The members of UKR Nexgen LLC are: (1) UAK 2020 Irrevocable Trust, whose trustees are Yitzchok Rokowsky and Aviva Kahanow, and (2) Aviva Kahanow, who is a citizen of New Jersey.

26.    Each of the trustees referenced in the preceding paragraphs is a citizen of New Jersey.

27.    Accordingly, each of the Plaintiffs is a citizen of New Jersey.

28.    Defendant White Oak Healthcare Finance, LLC is a limited liability company organized under Delaware law. Its principal place of business is in New York, New York. Upon information and belief, none of White Oak's members is a citizen of New Jersey. Plaintiffs' counsel has conducted a reasonable inquiry, including review of publicly available filings and other court records, and has found no indication that any member of White Oak is a citizen of New Jersey.

6

29.    White Oak holds itself out as a lender of "flexible and efficient capital directly to middle-market healthcare companies," https://whiteoaksf.com/industry-expertise/healthcare/.

30.    White Oak is party to a FATA with at least some of the New Operators. It is also party to a Revolving Credit Agreement with non-party Genesis.

31.    White Oak has extended hundreds of millions of dollars or more in credit to businesses in the healthcare space. https://whiteoaksf.com/industry-expertise/healthcare/. It is a creditor of Genesis pursuant to the asset-based loan set forth in the Revolving Credit Agreement, and, as of July 2025, Genesis had outstanding debt to White Oak purportedly exceeding $288 million.

32.    Non-party Genesis Healthcare Inc. is party to certain provisions of the OTAs. Genesis is the debtor in a pending Chapter 11 bankruptcy case, No. 25-80185 (SGJ) (Bankr. W.D. Tex. July 9, 2025). Genesis's principal place of business is in Kennett Square, Pennsylvania.

33.    Three of Genesis's affiliates or subsidiaries – GHC TX Operations LLC, as successor to 1526 Lombard Street SNF Operations II LLC and Peninsula Regional/Genesis ElderCare, LLC; 3485 Davisville Road Operations II LLC; and 501 Thomas Jones Way Operations LLC – are the "Existing Operators" as defined in the OTAs. At least some of the Existing Operators are also parties to FATAs with at least some of the New Operators and White Oak.

### STATEMENT OF JURISDICTION

34.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332 based on the complete diversity of the parties.

35.    Plaintiffs are citizens of New Jersey.

36.     On information and belief, Defendant White Oak Healthcare Finance, LLC is organized under Delaware law and headquartered in New York, and is not a citizen of New Jersey.

37.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, in this judicial district.

**FACTS**

**A.     Plaintiffs' Operation of Skilled Nursing Facilities**

38.     Plaintiffs are in the business of owning and operating SNFs and other senior living communities.

39.     SNFs are inpatient facilities that provide short- and long-term medical care and rehabilitation services to individuals recovering from illness, injury, or surgery, often after a hospital stay. SNFs can be staffed with registered nurses, therapists, physicians, and other medical professionals who provide services to SNF patients.

40.     Plaintiffs provide a variety of services to their patients. In turn, Plaintiffs submit requests for payment for these services from Medicare and other third-party payors such as HMOs.

41.     Pursuant to the May 9 OTA, the New Operator took transfer of the Bay Harbor Post Acute facility from Genesis's affiliate and "Existing Operator" GHC TX Operations LLC, as successor by merger to Peninsula Regional/Genesis ElderCare, LLC.

42.     Pursuant to the December 31 OTA, New Operators took transfer of the operations of three SNFs from Genesis –*i.e.*, from the "Existing Operators" of the three facilities: GHC TX Operations LLC, as successor by merger to 1526 Lombard Street SNF

8

Operations II LLC; 3485 Davisville Road Operations II LLC; and 501 Thomas Jones Way Operations LLC.

43.    Under the OTAs, the parties recognized that, after closing and until Plaintiffs obtained their own Medicare billing authorizations and negotiated new agreements with third-party payors (such as HMOs), the Existing Operators (*i.e.*, Genesis) would receive reimbursements from the U.S. Department of Health and Human Services' Centers for Medicare & Medicaid Services and other third-party payors for post-closing services provided by Plaintiffs (along with any accounts receivable related thereto, including certain reimbursable Medicare bad debt, "Post-Closing Reimbursement Funds").

44.    Consistent with industry custom and as set forth in the OTAs, those payments were (and continue to be) received by Genesis until Plaintiffs obtain their authorizations from the regulators.

45.    This is not a choice, but a requirement. Until Plaintiffs receive their authorizations, they can *only* submit for reimbursement through Genesis's billing identification number. Payments made under that number are received by Genesis – not the New Operators – in the first instance.

46.    The SNFs operated by Plaintiffs provide care to over 400 residents. To properly care for those residents, Plaintiffs must be reimbursed for the services they provide. Plaintiffs depend on regular payments from Medicare and other third-party payors to fund the day-to-day operations of their SNFs. Those funds are essential to making payroll, paying vendors, maintaining the facilities, covering utilities, taxes, and other expenses, and ensuring day-to-day operations continue without disruption.

47.     Plaintiffs seek to recover in this litigation those Post-Closing Reimbursement Funds that were swept by White Oak before Genesis's Chapter 11 bankruptcy and never distributed to the Plaintiffs.

**B.    Plaintiffs' Entitlement to Post-Closing Reimbursement Funds under the OTAs**

48.     Plaintiffs and Genesis entered into Operations Transfer Agreements on May 9, 2024 (with respect to the Bay Harbor facility) and December 31, 2024 (with respect to Graduate Post Acute, Willow Grove Post Acute, and Exton Post Acute).

49.     The OTAs set forth the parties' rights, duties and obligations with respect to the ownership and operation of the four SNF facilities, which were transferred from the four "Existing Operators", *i.e.*, Genesis, to the four "New Operators", *i.e.*, Plaintiffs.

50.     At the time of closing, as is industry standard (*see supra* at ¶¶ 3, 34), Plaintiffs did not have Medicare provider numbers or Medicare reimbursement agreements, and thus they were not yet eligible to receive Medicare payments directly. Section 2.8 of the OTAs, titled "Medicare and Medicaid," addresses this issue and states: "New Operators shall be permitted to bill for services performed following the Closing under Existing Operators' Medicare numbers, to the extent permitted by applicable Legal Requirements." *See* Ex. 1, at § 2.8(a); *accord* Ex. 2, at § 2.8(a).

51.     Moreover, Plaintiffs had not yet negotiated their own agreements with other third-party payors, including HMOs, with respect to the four SNFs. Section 2.5(b) of the OTAs addresses post-closing funds received from third-party payors other than Medicare, distinguishing between those belonging to the Former Operators (*i.e.*, for services *pre*-closing) and those belonging to New Operators (*i.e.*, for *post*-closing services). *See* Ex. 1, at § 2.5(b); Ex. 2, § 2.5(b).

52.     Thus, as is customary in the industry, the parties agreed that the New Operators could bill for services performed or costs incurred after the Closing Date under the Existing Owners' Medicare provider numbers and third-party payor agreements, but those amounts billed belong to the New Operators.

53.     Because Plaintiffs billed under Genesis's Medicare numbers and agreements, payments for Plaintiffs' post-closing services (as defined above, "Post-Closing Reimbursement Funds") were remitted to Genesis, even though Plaintiffs provided such services and were entitled to payment.

54.     Once again, the parties expected this to happen and the OTAs specifically provide for how Post-Closing Reimbursement Funds would be handled. Section 2.8(c) provides: "Existing Operators shall forward all such Medicare or Medicaid reimbursements in accordance with Section 2.5(b) to the accounts designated in writing by New Operators to Existing Operators until such time as reimbursements are remitted directly to New Operators by Medicare and Medicaid." Ex. 1, § 2.8(c); *accord* Ex. 2, § 2.8(c).

55.     Consistent with these directives, Section 2.8(b) states that "[n]othing set forth herein shall be deemed to limit in any way … New Operators' right, title, and interest in their cash and accounts receivable for services rendered on and after the Closing Date, which cash and accounts receivable are property of New Operators and shall be reimbursed or retained, as applicable, in accordance herewith." Ex. 1, § 2.8(b); *accord* Ex. 2, § 2.8(b).

56.     Section 2.5(d) requires Genesis to hold Post-Closing Reimbursement Funds in trust and remit them promptly to Plaintiffs: 'To the extent either Party receives any proceeds from the accounts receivable of the other Party, the Parties acknowledge that

the Party receiving the payment belonging to the other Party shall hold the payment in trust. ... Nothing herein shall be deemed to limit in any way either Party's rights and remedies to recover accounts receivable due and owing to it under the terms of this Agreement." Ex. 1, § 2.5(d); *accord* Ex. 2, § 2.5(d).

57.     As is typical in this sort of operations transfer agreement in this industry – a practice that White Oak is aware of – the OTAs expressly reflect the parties' intent that: (a) the Post-Closing Reimbursement Funds are property of the New Operators (Plaintiffs) and not the former operators (Genesis); (b) to the extent the former operators receive any Post-Closing Reimbursement Funds of any of the New Operators, the former operators must hold any such funds in trust for the New Operators; and (c) the former operators had and have a duty to remit promptly any Post-Closing Reimbursement Funds to the New Operators.

### C.    The Facility Accounts Transition Agreement Protects Plaintiffs from White Oak and Genesis's Misuse of Plaintiffs' Property

58.     The parties, including White Oak, knew that Genesis would receive funds owned by New Operators during the transition period. Indeed, and as explained below, White Oak and Plaintiffs Exton Post Acute, Graduate Post Acute, and Willow Grove Post Acute entered into a FATA to address those very funds.

59.     The FATA expressly acknowledges that Post-Closing Reimbursement Funds are the property of New Operators. It states that "Existing Operators and New Operators have advised [White Oak] that, for a period of time following the Closing Date, Existing Operators may come into possession of collections ... arising from the provision of services or sale of goods on or after the Closing Date (collectively, "**Accounts**") that are

the property of the New Operators pursuant to the terms and conditions of the OTA (such

collections, the "**New Operator Amounts**")." Ex. 3, p.1 at E (emphasis in original).

60.     The stated purpose of the FATA was to "set forth the process for paying an

amount equal to the New Operator Amounts [*i.e.*, Post-Closing Reimbursement Funds]

over to New Operators." *Id*. p.2 at G.

61.     Section 2 further provides:

> New Operator Amounts are the property of New Operators
> pursuant to the terms and conditions of the OTA. The OTA
> contemplates that certain New Operator Amounts may be
> received by Existing Operators after the Closing Date and,
> pursuant to the OTA, Existing Operators have agreed to
> transfer to New Operators an amount equal to the New
> Operator Amounts received by Existing Operators. Each
> Agent [*e.g.*, White Oak] agrees and acknowledges that New
> Operator Amounts (a) do not constitute Agent's or Lenders'
> collateral under its Credit Agreement, (b) are the property of
> New Operators pursuant to the terms and conditions of the
> OTA, and (c) are to be held in trust by Existing Operators for
> the benefit of New Operators. Effective as of the Closing Date,
> Agent hereby releases its Liens on all of the Transferee Assets,
> including without limitation, Transferee A/R (each as defined
> below [but which includes Post-Closing Reimbursement
> Funds, *id*. § 8]). In consideration of the agreements set forth
> herein, New Operators and Existing Operators agree, for the
> benefit of Controlling Lien Agent and the Lenders, to comply
> with the terms of Section 2.5 of the OTA with respect to the
> handling of accounts receivable after the Closing Date.

*Id*. § 2.

62.     Section 3 further provides that White Oak must "promptly turnover, deliver

and/or transfer to Existing Operators, in accordance with Section 4 [of the FATA], any

such New Operator Amounts identified by Existing Operators pursuant to the existing

reconciliation process under the ABL Loan Agreement, under which Existing Operators

provide to ABL Agent [White Oak], on a daily basis, a reconciliation report which includes

all accounts receivables evidenced by remittance advices .... processed on such day

(collectively, the "**Reconciliation Process**"), as New Operator Amounts and that Existing Operators are obligated to transfer to New Operators pursuant to the OTA." *Id.* § 3 (emphasis in original).

63.    White Oak "agrees to transfer to Existing Operators … an amount equal to the New Operator Amounts received in the Payment Account identified by Existing Operators to [White Oak] pursuant to the Reconciliation Process …. and which Existing Operators shall identify to [White Oak] promptly … which transfer shall be made by [White Oak] … including, without limitation, during any insolvency or receivership proceeding, or any proceeding under the U.S. Bankruptcy Code of 1978, as amended (11 U.S.C. 101 et. seq.) or any other proceeding under any other bankruptcy or insolvency laws. Existing Operators acknowledge that the first dollars released by [White Oak] to Existing Operators shall constitute New Operator Amounts Payments." *Id.* § 4.

64.    Accordingly, the FATA establishes a mandatory process by which Genesis was required, through daily reconciliation reports, to identify Post-Closing Reimbursement Funds belonging to Plaintiffs/New Operators and the timing and mechanics by which White Oak was obligated to transmit those funds back to Plaintiffs through Genesis.

65.    White Oak is very familiar with facilities account transfer agreements and the interests and rights they are intended to protect in transactions like these.

**D.    White Oak Failed to Remit Post-Closing Reimbursement Funds**

66.    White Oak breached its obligation to return such funds to Genesis.

67.    The following table reflects the estimated amounts that were actually remitted to Genesis (and Existing Operators) on account of services provided by the New Operators at the four SNFs, and swept to White Oak, which have not been remitted to the

New Operators[3]:

| New Operator | Existing Operator | Post-Closing Reimbursements |
|---|---|---|
| Exton Operator LLC | 501 Thomas Jones Way Operations LLC | $158,371.00 |
| Graduate Operator LLC | GHC TX Operations LLC | $432,457.00 |
| Willow Grove Operator LLC | 3485 Davisville Road Operations II LLC | $950,404.00 |
| Bay Harbor Operator LLC | GHC TX Operations LLC | $662,504.00 |
| | Total | $2,203,736.00 |

68.    Genesis and White Oak do not and cannot dispute that these Post-Closing Reimbursement Funds belong to Plaintiffs.

69.    These amounts were swept by White Oak from Genesis's accounts and retained by White Oak.

70.    However, upon information and belief, such amounts were not identified in Genesis's daily reconciliation reports, returned by White Oak to Genesis, or turned over by Genesis to the New Operators in accordance with Section 3 of the FATA and as contemplated by the OTAs.

71.    Instead, upon information and belief, White Oak applied these funds to reduce Genesis's debt. In other words, during the summer of 2025, White Oak routinely took Post-Closing Reimbursement Funds belonging to Plaintiffs and used them to service Genesis's obligations under the terms of Genesis's asset-based loan from White Oak.

---

3    These amounts are those currently known to Plaintiffs, who reserve the right to revise these numbers based on further review, subsequent developments, and discovery.

### E. White Oak Retained the Post-Closing Reimbursement Funds as Part of a Scheme to Defraud the New Operators

72.    White Oak's failure to turnover the Post-Closing Reimbursement Funds was not a mere mistake – it was part and parcel of the scheme White Oak and Genesis hatched to defraud Plaintiffs.

73.    Long before summer 2025, Genesis was in deep financial trouble and needed continued access to financing from White Oak.

74.    At the same time, White Oak desired to limit its exposure to Genesis's debt by using every available option to reduce Genesis's loan balance. White Oak and Genesis thus took advantage of their access to – and opportunity to use – the Post-Closing Reimbursement Funds. They devised a plan through which White Oak swept the Post-Closing Reimbursement Funds but did *not* return such Funds to Genesis for payment to the New Operators.

75.    Unsurprisingly, neither White Oak nor Genesis revealed this scheme to the New Operators. To the contrary – to keep the New Operators from exercising their rights under the FATA (as they unquestionably would have done) – Genesis falsely assured the New Operators that the Post-Closing Reimbursement Funds were on their way.

76.    On numerous occasions between the closing and up through the time Genesis filed for bankruptcy, the New Operators contacted Genesis about Post-Closing Reimbursement Funds due, including payments that were either late or incomplete, and Genesis assured the New Operators that payments were forthcoming and that Genesis did not intend to withhold the Post-Closing Reimbursement Funds from the New Operators.

      a.    On May 28 and June 4, 2025, Genesis was asked to process a wire for close to $2.8 million owed to the New Operators.  A manager from Genesis

assured the New Operators that the wire would be sent on June 5. However, the full amount was never received.

b. On June 12, 2025, multiple e-mails were sent to Genesis's Chief Financial Officer regarding the missing Post-Closing Reimbursement Funds, highlighting that the failure to pay was "simply not acceptable," that "[i]t's frustrating that we continue to find ourselves in the position of chasing down funds every few weeks," that "we have never had to operate this way," that "I don't understand why we can't adhere to the basic norm of disbursing funds promptly when they come in," and that "[i]t should not feel like a deliberate effort by Genesis to hold onto these funds for as long as possible." Genesis's CFO responded that day and assured the New Operators that he would circle up internally and get back to the New Operators.

c. Five days later, another follow-up e-mail was sent to Genesis's CFO about the outstanding Post-Closing Reimbursement Funds, and because an additional payment would be due by the end of that week.  Again, Genesis's CFO assured the New Operators that he would check with his team and that "we don't want to hold your money."

d. Nevertheless, Genesis subsequently failed to make the additional reconciliation payment (totaling ~$2.7 million) on the date it was due, which the New Operators contacted Genesis's CFO about on July 9, 2025.

e. Throughout this time, a representative of the New Operators had several phone conversations with Genesis's Chief Financial Officer, during which he was repeatedly assured that Genesis would pay the Post-Closing Reimbursement Funds to the New Operators.

77.    But Genesis's assurances were not true. No payment was forthcoming, as Genesis and White Oak knew would happen. White Oak was already using the Post-Closing Reimbursement Funds to pay down its debt with full knowledge they belonged to the New Operators.

78.    The New Operators requested but have not been given access to the daily reconciliation reports Genesis provided White Oak. Without those reports, it is impossible to determine precisely how White Oak and Genesis carried out their scheme.

79.    Upon information and belief, the Post-Closing Reimbursement Funds intentionally were not identified (or were intentionally underreported) on Genesis's daily reconciliation reports so that White Oak could keep such Funds for itself and credit them against the amounts Genesis owed it.

80.    But even if those Funds *were* identified, White Oak *still* breached its obligation to pay them to Genesis. Either way, White Oak was misappropriating the Post-Closing Reimbursement Funds and knew it was doing so.

**F.    Genesis Files Bankruptcy Cases**

81.    That practice continued until Genesis and nearly 300 of its affiliated entities – including the Existing Operatores – filed for Chapter 11 bankruptcy protection on July 9, 2025. *See In re Genesis Healthcare, Inc.*, Case No. 25-80185-SGJ11 (Bankr. N.D. Tex.).

82.    At the First Day Hearing and in Genesis's related submissions, Genesis conceded that it did not maintain Plaintiffs' Post-Closing Reimbursement Funds in trust and did not remit them to the New Operators.

83.    To the contrary, Genesis explained that the Post-Closing Reimbursement Funds were delivered to White Oak through daily sweeps of the Genesis accounts. Genesis

has not told the New Operators what White Oak did with those Funds after receiving them.

### G.    Plaintiffs Demand that White Oak Return the Post-Closing Reimbursement Funds; White Oak Refuses, but Admits to Having Received Post-Closing Reimbursement Funds

84.    On July 23, 2025, after learning of White Oak's unlawful seizure and retention of the Post-Closing Reimbursement Funds, Plaintiffs sent a letter to White Oak demanding the return of those sums and a full accounting of funds swept from Genesis's bank accounts. Ex. 4.

85.    White Oak responded by letter dated July 31, 2025. Ex. 5. In the letter, White Oak refused to return any Post-Closing Reimbursement Funds or account for its sweeps of Genesis's accounts.

86.    White Oak further contended that Plaintiffs could only recover from Genesis and blamed Plaintiffs for not obtaining stronger oversight of Genesis's accounts through contractual bargains. Among other things, White Oak stated that the New Operators *could* have "request[ed] a selling operator and its lender to enter into a facilities account transition agreement (known in the industry as a 'FATA')." Ex. 5 at 1. White Oak continued: "[New Operators] failed to facilitate an agreement to monitor the processing and reconciliation of receivables in its transactions and now that Genesis has filed for bankruptcy, cannot try to overcome such shortcoming by trying to now conjure up some duty between third-party White Oak and [the New Operators]." *Id.*

87.    But Plaintiffs are not trying to conjure up *anything*. The FATA (which *does* exist) proves that White Oak knew it was holding Plaintiffs' cash. Still, despite having no excuse or justification for its conduct, White Oak has failed to return the Post-Closing

Reimbursement Funds that are indisputably Plaintiffs' property and has failed to provide the accounting requested by Plaintiffs.

88.     White Oak cannot lawfully retain this money that belongs to Plaintiffs and should be returned to them.

## COUNT I
## BREACH OF CONTRACT (FATA)

89.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

90.     The FATA is a binding and enforceable agreement between Plaintiffs, Genesis, and White Oak.

91.     The FATA, like all contracts, imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement.

92.     The implied covenant of good faith and fair dealing ensures that parties to a contract perform the substantive bargained-for terms of their agreement without taking any action that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

93.     Even conduct technically permissible under an agreement may nevertheless give rise to a breach of the implied covenant of good faith and fair dealing if it is intended to achieve a result that is prohibited by the agreement.

94.     The FATA imposes an obligation on Genesis to identify all Post-Closing Reimbursement Funds belonging to Plaintiffs in daily reconciliation reports provided to White Oak.

95.     It also imposes an obligation on White Oak to review the reconciliation reports and remit Post-Closing Reimbursement Funds to Plaintiffs through Genesis.

96.    If Genesis failed to accurately report to White Oak any Post-Closing Reimbursement Funds, and White Oak knowingly retained such funds, White Oak is liable to Plaintiffs for breach of the implied covenant of good faith and fair dealing.

97.    Although White Oak *may* have technically carried out its contractual obligations, it did so in bad faith by retaining funds it *knew* belonged to its contractual partner.

98.    White Oak's material breaches of the implied covenant were intentional, knowing, and in willful and reckless disregard of the rights and interests of the New Operators.

99.    The implied covenant of good faith and fair dealing prohibits White Oak from retaining Post-Closing Reimbursement Funds it knows belong to Plaintiffs, merely because those funds were not identified by Genesis in accordance with the FATA's terms.

100.    As a direct and proximate result of White Oak's breach of the implied covenant of good faith and fair dealing, Plaintiffs were damaged by the loss of Post-Closing Reimbursement Funds totaling $2.2 million or more.

101.    Alternatively, if in accordance with Section 3 of the FATA, Genesis identified in the daily reconciliation reports Post-Closing Reimbursement Funds in the amount of $2.2 million dollars that were owed to Plaintiffs, then *still* White Oak improperly holds these funds.

102.    In such a circumstance, White Oak failed to remit those sums to Plaintiffs, through Genesis, in accordance with Section 3 of the FATA's express terms, thereby breaching that agreement.

WHEREFORE, Plaintiffs respectfully request that this Court award compensatory damages and such other and further relief the Court deems appropriate.

## COUNT II
## MONEY HAD AND RECEIVED
## (IN THE ALTERNATIVE TO COUNT I)

103.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

104.    The Post-Closing Reimbursement Funds, which indisputably belong to the New Operators, have been wrongfully diverted from their proper use by White Oak.

105.    In equity and good conscience, White Oak has an inferior claim to the Post-Closing Reimbursement Funds, and the law implies a promise to pay those sums over to Plaintiffs, who have a greater right to them.

106.    White Oak knew, as confirmed by the terms of the FATA, that Genesis was in receipt of Post-Closing Reimbursement Funds, Ex. 3 at 1; that Genesis did not own those funds and had an obligation to hold them in trust and return them to their rightful owners; and that White Oak's sweeps of Genesis's operating accounts would capture such amounts.

107.    White Oak therefore conceded that it captured within its sweeps the property of Plaintiffs and had an obligation to return such sums, and was on notice that Post-Closing Reimbursement Funds were held in Genesis's accounts that White Oak was sweeping.

108.    Notwithstanding that White Oak held at least $2.2 million of Post-Closing Reimbursement Funds as of July 9, 2025, White Oak has not released *any* Post-Closing Reimbursement Funds for disbursement to the New Operators since that date.

109.    It would be inequitable, unjust, and unconscionable to allow White Oak to retain the Post-Closing Reimbursement Funds which have provided a windfall to White

Oak at the New Operators' expense and to Plaintiffs' detriment, without payment for value.

110.    Plaintiffs plead, in the alternative, that they have been harmed as a result of White Oak's conduct with respect to all Post-Closing Reimbursement Funds, in amounts exceeding $2.2 million, and it would be inequitable to allow White Oak to retain such amounts.

WHEREFORE, Plaintiffs respectfully request that this Court enter an appropriate order requiring White Oak to provide an accounting of all funds swept from Genesis's bank accounts since May 9, 2024 and return all Post-Closing Reimbursement Funds owned by Plaintiffs; imposing a constructive trust in Plaintiffs' favor; and such other and further relief the Court deems appropriate.

**COUNT III**
**UNJUST ENRICHMENT**
**(IN THE ALTERNATIVE TO COUNT I)**

111.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

112.    In the alternative, (a) to the extent there is no FATA in place between Plaintiff Bay Harbor, White Oak, and Genesis; or (b) if there is no effective FATA between the Plaintiffs, White Oak, and Genesis, as asserted in White Oak's letter of July 31, 2025, White Oak is liable to Plaintiffs for unjust enrichment.

113.    Plaintiffs conferred a benefit on White Oak in the form of the Post-Closing Reimbursement Funds that were collected by White Oak from Genesis. To date, such funds total approximately $2.2 million or more.

114.    White Oak appreciated and retained the unjust benefits conferred by Plaintiffs. The excess of $2.2 million in Post-Closing Reimbursement Funds were

collected from Genesis's accounts, and White Oak has used them for its own purposes and has withheld them from Plaintiffs.

115.    It would be inequitable for White Oak to retain these funds, including without limitation because White Oak has not provided any consideration to Plaintiffs for the Post-Closing Reimbursement Funds and because White Oak knew that Genesis was in possession of Post-Closing Reimbursement Funds, had a duty to hold such funds in trust for Plaintiffs, and that White Oak's sweeps of Genesis's bank accounts captured such sums.

116.    In the alternative to Count I, Plaintiffs are entitled to recover for White Oak's unjust enrichment of amounts exceeding $2.2 million. It would be inequitable to allow White Oak to retain such amounts, which should be returned to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court enter an appropriate order requiring White Oak to provide an accounting of all funds swept from Genesis's bank accounts since May 9, 2024 and return all Post-Closing Reimbursement Funds owned by Plaintiffs; imposing a constructive trust in Plaintiffs' favor; and such other and further relief the Court deems appropriate.

## COUNT IV
## CONVERSION

117.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

118.    The Post-Closing Reimbursement Funds are chattels belonging to Plaintiffs. As the FATA acknowledges and White Oak is otherwise well aware, these Funds "are property of the New Operators." Ex. 3, § 3. White Oak has wrongfully exercised dominion

or control over Plaintiffs' Post-Closing Reimbursement Funds by using $2.2 million of those Funds as though they belong to White Oak.

119.    White Oak had no right to retain the Post-Closing Reimbursement Funds.

120.    To the contrary, Plaintiffs own and have the right to immediately possess the Post-Closing Reimbursement Funds, which White Oak concedes "are property of the New Operators." *Id.*

121.    White Oak deprived Plaintiffs of their rights in such property, including in the use or possession of such property, and assumed and exercised control over it without consent, authorization, or justification by retaining possession of these funds.

122.    Plaintiffs demanded the return of their property, thereby making White Oak subjectively aware of the harm to which its conduct subjected Plaintiffs to the extent it was not already aware of that harm.

123.    Yet White Oak refused, unreasonably withholding possession of the Post-Closing Reimbursement Funds from Plaintiffs in conscious disregard of the harm its actions caused Plaintiffs. *See* Exs. 4, 5.

124.    Plaintiffs have been harmed as a result of White Oak's conversion of the Post-Closing Reimbursement Funds, in amounts exceeding $2.2 million.

WHEREFORE, Plaintiffs respectfully request that this Court enter an appropriate order: (1) requiring White Oak to provide an accounting of all funds swept from Genesis's bank accounts since May 9, 2024; (2) compelling it to return all Post-Closing Reimbursement Funds owned by Plaintiffs; (3) imposing a constructive trust in Plaintiffs' favor; (4) awarding punitive damages; and (5) such other and further relief the Court deems appropriate.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT

125.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

126.    Plaintiffs had existing contractual relations with Genesis through the OTAs.

127.    White Oak is a non-party stranger to the OTAs.

128.    The OTAs established that Post-Closing Reimbursement Funds were the property of the Plaintiffs, and Genesis was obligated to hold those funds in trust for Plaintiffs.

129.    White Oak knew of the existence of the OTAs and the obligation they imposed on Genesis to hold Post-Closing Reimbursement Funds in trust in favor of Plaintiffs.

130.    Nevertheless, White Oak intentionally interfered with the OTAs – and procured Genesis's actual breach of those agreements – by sweeping Genesis's bank accounts, collecting Post-Closing Reimbursement Funds belonging to Plaintiffs, and knowingly and intentionally retaining those sums notwithstanding Plaintiffs' demand.

131.    In so doing, White Oak acted without privilege or justification. To the contrary, White Oak acted unlawfully by working with Genesis to hold and use Post-Closing Reimbursement Funds that indisputably belong to the New Operators.

132.    White Oak appreciated the unjust benefits conferred by Plaintiffs. The excess of $2.2 million in Post-Closing Reimbursement Funds have been available for White Oak's general use.

133.    Plaintiffs have been harmed as a result of White Oak's interference with the OTAs, in amounts exceeding $2.2 million.

WHEREFORE, Plaintiffs respectfully request that this Court enter an appropriate order: (1) requiring White Oak to provide an accounting of all funds swept from Genesis's bank accounts since May 9, 2024; (2) compelling it to return all Post-Closing Reimbursement Funds owned by Plaintiffs; (3) imposing a constructive trust in Plaintiffs' favor; (4) awarding punitive damages; and (5) such other and further relief the Court deems appropriate.

**COUNT VI**
**AIDING AND ABETTING FRAUD**

134.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

135.    Third-party Genesis defrauded the New Operators when it falsely represented to the New Operators that it both was providing daily reconciliation reports to White Oak and would return the Post-Closing Reimbursement Funds to the New Operators.  Among other things:  (a) Genesis assured it would pay a $2.8 million sum due pursuant to a reconciliation report in June 2025, and only made a partial payment; (b) Genesis's chief financial officer sent multiple emails assuring that Genesis would make all payments due to the New Operators and that they "did not want to hold your money"; and (c) Genesis's chief financial officer repeated these assurances in phone calls with representatives of the New Operators.

136.    Genesis knew these misrepresentations were false. Genesis was both aware that the Post-Closing Reimbursement Funds would only be returned to the New Operators if those Funds were accurately reported in the daily reconciliation reports and that it had not done so. Still, it falsely represented that the transfers would be made.

137.    Genesis made these misrepresentations with the intent to defraud the New Operators and prevent them from exercising their rights under the FATA and OTAs. Genesis had both the motive and opportunity to do so – it controlled the Post-Closing Reimbursement Funds (even though such funds belong to the New Operators and were being held by White Oak) and was able to use those Funds to pay down the debts it owed to White Oak.

138.    The New Operators relied on Genesis's false representations. In reliance on Genesis's assurances that Post-Closing Reimbursement Funds would be delivered to the New Operators, the New Operators continued to bill for their services under Genesis's Medicare provider numbers and pursuant to Genesis's contracts with third-party payors. In addition, without these false representations, the New Operators would have enforced their rights under the FATA and mandated that Genesis promptly provide reconciliation reports accurately reflecting the amount of Post-Closing Reimbursement Funds it received.

139.    This reliance was justified. The New Operators did not have access to the reconciliation reports. Accordingly, it was peculiarly within the knowledge of Genesis and White Oak whether those reports accurately reflected the Post-Closing Reimbursement Funds that Genesis received.

140.    Genesis did not undertake this fraudulent scheme on its own.  Instead, White Oak aided and abetted Genesis's fraud. Upon information and belief, White Oak had actual knowledge of this fraud. White Oak knew that its sweeps would capture Post-Closing Reimbursement Funds belonging to the New Operators.

141.    But when Genesis either stopped or significantly delayed providing reconciliation reports identifying such Funds or grossly underreported the amount of

Funds it received, White Oak continued to sweep and apply such Funds to its own benefit without asking questions.

142.    White Oak thus had actual knowledge that: (1) it was in possession of Post-Closing Reimbursement Funds; (2) such Funds belong to the New Operators; and (3) White Oak was using those Funds for its own benefit.

143.    Furthermore, White Oak substantially assisted Genesis in carrying out its fraud. White Oak swept the Post-Closing Reimbursement Funds that belong to the New Operators and then, upon information and belief, used such funds to reduce the outstanding balance of Genesis's debts to White Oak.

144.    The New Operators have been harmed as a direct and proximate result of White Oak's tortious conduct with respect to all Post-Closing Reimbursement Funds, in amounts exceeding $2.2 million, and it would be inequitable to allow White Oak to retain such amounts.

WHEREFORE, Plaintiffs respectfully request that this Court enter an appropriate order: (1) requiring White Oak to provide an accounting of all funds swept from Genesis's bank accounts since May 9, 2024; (2) compelling it to return all Post-Closing Reimbursement Funds owned by Plaintiffs; (3) imposing a constructive trust in Plaintiffs' favor; (4) awarding punitive damages; and (5) such other and further relief the Court deems appropriate.

## COUNT VII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

145.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

146.    At all material times hereto, third-party Genesis and the Existing Operators acted as the New Operators' agent with respect to the Post-Closing Reimbursement Funds, which Genesis was obligated to hold in trust for the New Operators, and which Genesis was obligated to account for by providing daily reconciliation reports to White Oak.

147.    Third-party Genesis had fiduciary duties of loyalty, due care and good faith to the New Operators, which required, at a minimum, that they take all action legally necessary and appropriate to protect the New Operators' interest in the Post-Closing Reimbursement Funds, and to act solely in the New Operators' best interests in collecting, retaining, dispensing, and accounting for those funds.

148.    Genesis breached its fiduciary duties to the New Operators when it, among other things, failed to provide daily reconciliation reports to White Oak and/or return the Post-Closing Reimbursement Funds to the New Operators.

149.    White Oak aided and abetted Genesis's breach of its fiduciary duty to the New Operators. Upon information and belief, White Oak had actual knowledge of this breach. White Oak knew that its sweeps would capture Post-Closing Reimbursement Funds belonging to the New Operators, thereby preventing Genesis from fulfilling its fiduciary duties to the New Operators.

150.    When Genesis either stopped or significantly delayed providing reconciliation reports identifying such Funds or grossly underreported the amount of Funds it received, White Oak continued to sweep and apply such Funds to its own benefit without asking questions.

151.    White Oak thus had actual knowledge that: (1) it was in possession of Post-Closing Reimbursement Funds; (2) such Funds belong to the New Operators; and (3) White Oak was using those Funds for its own benefit.

152.    Furthermore, White Oak substantially assisted Genesis in the breach. White Oak swept the Post-Closing Reimbursement Funds that belong to the New Operators. Upon information and belief, it then used such funds to reduce the outstanding balance of Genesis's debts to White Oak.

153.    The New Operators have been harmed as a direct and proximate result of White Oak's tortious conduct with respect to all Post-Closing Reimbursement Funds, in amounts exceeding $2.2 million, and it would be inequitable to allow White Oak to retain such amounts.

WHEREFORE, Plaintiffs respectfully request that this Court enter an appropriate order: (1) requiring White Oak to provide an accounting of all funds swept from Genesis's bank accounts since May 9, 2024; (2) compelling it to return all Post-Closing Reimbursement Funds owned by Plaintiffs; (3) imposing a constructive trust in Plaintiffs' favor; (4) awarding punitive damages; and (5) such other and further relief the Court deems appropriate.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter appropriate orders and judgments in their favor and against White Oak including: (a) an order requiring White Oak to provide an accounting of all funds swept from Genesis's bank accounts since May 9, 2024; (b) an order requiring White Oak to return all Post-Closing Reimbursement Funds owned by Plaintiffs; (c) awarding compensatory and punitive damages; (d) imposing a constructive trust in Plaintiffs' favor; (e) awarding pre- and post-judgment

interest; (f) awarding attorneys' fees and costs, to the extent such relief is available; and

(g) granting such other and further relief the Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

HANGLEY ARONCHICK SEGAL PUDLIN
& SCHILLER

Dated: March 2, 2026                    By: _____

Matthew A. Hamermesh
Andrew M. Erdlen
Gianni M. Mascioli
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
(215) 568-0300 (facsimile)
mhamermesh@hangley.com
aerdlen@hangley.com
gmascioli@hangley.com

*Attorneys for Plaintiffs*